You know that this case on document 2-14-0954, the Village of Vernon Hills, plaintiff's appellant v. Vernon Hills Police Pension Fund, all defendants at least, arguing on behalf of plaintiff's appellant, attorney's Paul Hunt, arguing on behalf of defendants at least, attorney's Eric J. Smith, also arguing on behalf of defendants at least, attorney's Mr. Charles W. Smith. Thank you. Mr. Hunt? Good morning. May it please the court. My name is Keith Hunt, and this morning I have the privilege of representing the Village of Vernon Hills in connection with this matter. We request that this court reverse the decision of the Circuit Court and of the Pension Board and find that Officer Mark Cisnoski is capable of rendering service to the department, and therefore rendering him ineligible for a line-of-duty disability pension. What services would he be rendering? He would be a detective working in the Investigations Division. Doing what? I'm sorry? Doing what? He would be assigned to a desk. As of September 1st of 2012, he was assigned to that position. I'm sorry, September 1st, 2011, he was assigned to that department, working in Investigations, where he was working at a desk investigating cases, following up on leads, making telephone calls, writing reports. Occasionally, he was requested to go to the Circuit Court in Waukegan to pick up a warrant and return it back to the station. He was transferred out of that position, though, was he not? He was not transferred. There's an important distinction that we need to make here. Police officers are assigned to a particular division or a particular unit. They may be, from time to time, temporarily detailed to another location, but when he was detailed to work in the Administrative Services Unit, he was still rendering service to the department, and it was on a temporary basis. The department management, the chief, had made a determination that, based upon the relative skill sets of the two officers involved and a desire to provide some level of experience to a pregnant female officer, that when, after she became pregnant, that the female officer was put into Investigations. There was a certain number of slots in Investigations, and so she was assigned there on a temporary basis, and the chief testified. In fact, the uncontroverted evidence in the administrative record is that as soon as the pregnant officer was returned to full duty after delivering her baby, Officer Mark Cisnoski was being reassigned to or was being redetailed to the Investigations Section, as he originally was. He was in a Support Services Unit then for a period of time. For a period of a few months while the pregnant officer was going through a pregnancy. Well, but doesn't the position have to be available under case law? I mean, if we were to look at whether he could be detailed there over a longer period of time, doesn't there have to be a firm offer with comparable working conditions, compensation, and tenure? Isn't that what the case law says? Yes, and that's exactly what he was given. He was given a position in the Investigations Section. The chief made clear that in a March, in what was marked as the Intervenors Exhibit 13, as part of the administrative record, a March 21, 2012, letter in which Officer Cisnoski was specifically told that he was in that position, he was to work in that position, as a desk job, that his duties and responsibilities were consistent with the medical findings of the Functional Capacity Act. That was a capacity evaluation that had been performed on him. Well, if he can be moved out of investigations, let's say for a year at a time or however long, how is that position comparable tenure to his previous position as a patrol officer? Well, I would respectfully submit, Justice, that the test is not whether it was comparable to his position as a patrol officer. What case are you relying on then for your position? Well, the Supreme Court in both Kazukas and in Peterson, this court previously in Thoreau, authored by Justice McLaren, specifically found that the test is not whether you can perform the same job as you did on the day of your injury. The issue is whether you are capable of rendering service to the department. Even part-time? I mean, he was not able to work eight hours a day. He was a four-hour-a-day schedule. And if he continued in that, he was not getting any credit for pension. Isn't that a key factor here? Well, we respectfully disagree. First of all, as of September 1st, Officer Sosnowski was assigned to the investigations on a permanent basis. The uncontroverted evidence in the record is, and the only testimony on this point, was that it was a permanent assignment and he was free to keep it until the time that he retired. Now, in turn, then after that, approximately two weeks or three weeks later, Officer Sosnowski, having already filed for his pension application the day before he returned to active duty in investigations, then went to his doctor and said, I have to drive to Waukegan, which is roughly half the distance he drives to and from home every day, and the drive is too much. It's too much time in the car. And it's bothering me when I park in front of the circuit court and I have to walk in to get a warrant. And so his office, his doctor said, Dr. Levin said, okay, then we'll take you out and we'll put you on a modified four-hour duty. Right. There's no evidence he was malingering, though. The record doesn't reflect that. I disagree, because one of the things... Who testified that he was malingering? Not malingering, but Dr. Levin specifically testified when pressed on this point that Officer Mark Sosnowski was capable of working the desk job in investigations eight hours a day. He was capable of doing that full-time. Every other doctor, all the board-appointed doctors, Ho, Sammo, and Tonino, each testified that Mark Sosnowski was capable of holding down the position in investigations on a full-time basis, working eight hours a day. At the time they saw him? And they testified only within a couple of months prior to the time of the pension board hearing. And that was uncontroverted evidence. What the board chose to rely on was the initial letters that they received back from the doctor after sending him with a job description that says, can this person be a patrol officer? And the doctors write back, no, he cannot. And we're not disputing at this point... You're not disputing that he can't be a patrol officer. A patrol officer, but that's not the test. And, in fact, if you look at the cases that we cite in our brief, not only Kouzoukis and Peterson and so forth, but you also look at the firefighter cases, which Peterson was, they talk about service to the department, including things other than being a firefighter or a paramedic. Being somebody who works in the fire prevention unit. And we would respectfully submit that when Mark Cisnoski worked in investigations, he was rendering service to the department. And that's what the testimony was from both the chief and the deputy chief. When Mark Cisnoski went to administrative support services, the deputy chief testified that he was rendering service to the department. Those are not clerical positions. They're not positions that are capable of being held by a non-sworn employee. You have to be a police officer in order to do that. And in this situation... Excuse me, counsel. Was there any evidence in the record indicating that any Vernon Hills police officer had spent a substantial portion of his or her career working in a limited capacity? There was some evidence. I don't know that the evidence dealt with regarding the duration, but I know there was evidence in the record that, for example, Officer Ken Berryhill, who was the person who had been initially misidentified in one of the videos coming to and from the police station using a cane. Officer Berryhill worked in the investigations division for several years, and he used a cane to go to work. He was not somebody who was capable of going out and tackling somebody to make an arrest. But that's not the definition of a police officer. The police officer definition within the pension code is one who is sworn as a police officer and who is assigned to perform duties as assigned by the chief of police. That is exactly what Officer Sosnowski was fulfilling in these roles. On another point, counsel, I believe in your brief you indicated that courts and other quasi-judicial bodies have interests in protecting the attorney-client relationship and have the authority to disqualify an attorney from representing a particular client to protect those interests. And you use as your authority In re, the estate of Clem. Do you recall that? Yes, Judge. Where in that case do they talk about quasi-judicial bodies? There is no reference in that case to quasi-judicial bodies. So how are we talking about whether the board here would have the power even to disqualify an attorney? Well, I believe that the board has the power and certainly the obligation to deal with the issue when it's raised. The fundamental problem is what authority? Well, they're conducting an administrative proceeding. And if there is an impropriety that's going to taint the nature of that proceeding, it should be dealt with at the front end as soon as it's brought to the body's attention. And if the board felt that it didn't have the legal authority to do it, then it certainly had the authority to refer the matter to or request an opinion from either the ARDC or the ISBA or to refer the matter, perhaps suggest that the parties go to the circuit court for clarification of the issue. But what the board did in this case is simply ignore the motion completely. We're not even going to deal with it. And that was the motion that was made in the administrative record. Are we even going to deal with this issue today? No. All right. But had they acted outside their authority, whatever they had done would be a nullity, would it not? I mean, isn't the board's authority prescribed and bounded by the statutory creation of the board? It is. And so where in there do I find the ability for them to make such rulings or to do any of the things respectfully that you suggest? Well, I think the board has the inherent power, the courts have said, to conduct and oversee the administrative proceedings before it and to conduct the administrative hearings, which it conducts, regarding the courts have said that it has the inherent power to limit cross-examination. It has the inherent power to do certain other things. Like what? Limit the length of the hearing or, as I say, conduct cross-examination. Those are the two examples that came out of the cases that have been decided. Isn't that a big stretch, though, between limiting cross-examination or we're going to knock off at five and disqualifying an attorney? Well, I mean, I appreciate your argument, but would you agree that that's a big leap? I would submit to you that if they're not going to do it, then where else in the process does it get done? Where else in this process? I mean, this is the process that's been created by the legislature, and the pension board is going to conduct a hearing. We have an obligation, we believe, under the rules of professional responsibility, as well as just basic common courtesy, to raise this at the earliest possible moment, as soon as we become aware of it. I became aware of it personally on April 9th. The first day of the hearing was April 10th, the following morning. We zipped off a quick motion to bring the issue to the court's attention, to bring it to Mr. Smith's attention. Is that notice to the other party, though? I'm sorry? Is that notice to the other party? No, we gave notice to Mr. Smith late that evening or early the following morning, as soon as I found out about it. We came in, we argued the motion, and the board chose not to hear it at all. And so, to respond to your question, Justice Jorgensen, you know, where in this process do we bring it? We have an obligation to bring it as quickly as possible. We believe we have the obligation to bring it before the administrative body. And if the administrative body didn't deal with it, then certainly we believe it should have been dealt with in the circuit court. The circuit court found, through an administrative review, that there was no conflict. We think that runs afoul of the ISBA opinions we've cited. We also think it runs afoul of the Verdoliak decision from the Illinois Supreme Court. In the Verdoliak situation, Mr. Verdoliak was an elected official who is basically dealing with the business of the city of Chicago. He's also representing workers' compensation care applicants against the city before the industrial commission. The court found that that was a conflict. They found that you have an undivided duty of loyalty when you have the role on behalf of the government. You also have an undivided duty of loyalty to your client, and those two cannot coexist. The law in this state is that a client of a particular lawyer in the firm is a client of every lawyer in the firm. And as long as that is the case, then when Mr. LaLuzerne voluntarily adopts a position and serves in an appointed role to the village in connection with the Board of Police Commissioners, which does all the hiring and promotion decisions of police officers, he now has adopted it. Doesn't the conflict come when you're in the same proceeding, counsel? I'm sorry? I said, doesn't the conflict come when you're dealing with the same proceeding? Is that what the rule looks at? May I continue? Yes. The rule looks at two things. One, it looks at simultaneous representation in the same proceeding, and it also looks at dual representation simultaneously, and that's what we're dealing with here. Well, he wasn't on the same commission. He was on the police commission. Isn't that correct? That's true. And in serving on the police commission, and the distinction I would draw is that whether he was dealing on the same body or whether it was a different body really begs the question. The point here is that he owed a duty to the village by virtue of serving in that role. He cannot then have either he or his partner adopt a diametrically opposed duty on behalf of a private client. That's exactly what the Supreme Court was concerned about in the Verdoliak decision. Even though Mr. Verdoliak in that decision, they noted that he had recused himself from ever voting on any workers' compensation matter or other measures of that sort. But in the end, the court found that even though he was not directly involved in dealing with workers' compensation matters on behalf of the city of Chicago, there was nevertheless a conflict of interest. Because he had adopted this dual position. And that's the same problem that we have here. Thank you, sir. Thank you. You'll have an opportunity to make the vote. Mr. Thomas? Pardon me. Ms. Thomas. Good morning. May it please the court. My name is Erica Thomas, and I'm here today representing the Vernon Hills Police Pension Fund. As the court is aware, this is quite an unusual matter in which we have a pensioner who's happy with the outcome of a disability pension application. And we have a pension fund who feels that the proper decision has been made. But yet we have an intervener who is very unhappy with the situation. The pension code empowers the fund to conduct the hearings and establish procedures during those hearings. Now, it's important to keep in mind this is not to be an adversarial proceeding. The pension fund serves a beneficent purpose. And that should always be kept in the back of the board's mind and now the court's mind. The administrative record in this matter reveals that the fund did in fact keep that in mind. It attempted to conduct a fair proceeding. It attempted to allow all the parties to be heard without making a circus out of the matter. And in doing so, it feels that it rendered a very fair and just result in this matter. Does the board agree that the evidence showed that Cisnowski was physically capable of working eight hours a day even in the investigator position? The board does not agree with that. And the board takes issue with a comment made by Mr. Hunt earlier before this court. If you look at the testimony of Dr. Levine, there's a deposition that's in the administrative record. Dr. Levine was specifically asked, and as, you know, just as a little bit of background, Dr. Levine was the workers' comp physician that the village sent Mr. Cisnowski to early on before any of the pension proceedings began. And, in fact, then Mr. Cisnowski was happy with his services and continued on with him and he became his personal physician. So the village was actually the initial connection between Dr. Levine and Mr. Cisnowski. Dr. Levine was specifically asked during this deposition, do you feel that he can work eight hours? And his testimony, you will find, says, well, he tells me he can't work eight hours. He tells me he can only work four hours. And he was asked something like, well, you know, do you just take him on his word? And he said, well, in most, you know, no, I don't take him on his word. There is corroborative medical evidence that corroborates what he is, his complaints to me. So if somebody just comes and says I can't do it, I'm not just going to automatically rubber stamp that and say that, you know, what he says is gold. But if there's corroborative medical evidence, and in this case there were, then he limited it to four hours. And that limit, the administrative record is silent that that limit had ever been lifted. So would it be safe to say that you and Mr. Hunt agree as to what the law is but not as to what the facts are in the case?  I'm talking about the issue that you just related, which was whether or not working in investigation for eight hours is sufficient to preclude the granting of a pension. And it seems to me, at least, that your response is not to attack that contention but to argue that the facts aren't as represented. Well, I agree with qualification there. If the position that is offered is a guaranteed permanent position written in stone that is never going to go away for this gentleman, and he's capable of doing that position, then sure, he can do that position. He can serve in the police department. And maybe to that end, your comment about the differentiation between the facts and the law, maybe that's where we're coming from here. Why does it have to be guaranteed if it isn't guaranteed as a police officer who's a patrolman? It is guaranteed as a police officer who's a patrolman. Aren't there disciplinary proceedings that result, just as there could be disciplinary proceedings relative to his work in the investigation division? Well, certainly there is a collective bargaining agreement that provides certain due process procedures. And certainly I would expect the investigator's position had those protections as well. But that patrol position is not something that is going to be changed. The job description is the job description. But this investigator's position was never made permanent as to Mr. Cisnowski's physical capabilities. It was simply the investigator's position that had been there or job description that had been there for years and years. It never said you don't have to make arrests. It never said you can only do this. It was never finalized or made permanent by the village. Well, is a police officer defined as being one who has been sworn and who is empowered to make arrests? Yes. And so if a police officer is excused from making arrests, does that mean that he's lost the authority to make the arrest? Or does it just mean that he has discretion to never exercise the authority that he has? He's been medically, in this particular case, he was medically advised not to participate in any active arrest. And the board's position was a police officer who cannot make an arrest is not a police officer. If you look in the record. So you're saying that someone who's assigned to the investigation division but who is capable of making an arrest is okay, but a police officer who's assigned to investigation who can't physically make an arrest is not? I'm saying that someone who is assigned to the investigation position who is, you know, arguably moved up the ranks because it is a it is a plumb position and still has to, according to the job description in the village of Vernon Hills, investigators still has all of the duties of patrol. But that's not what we had here. We had a gentleman who was simply assigned to that position, but yet can't do all the duties of control, even though it's part of the job description, can't make an arrest, even though it's part of the job description and can't work a full eight hour day, even though it's part of the job description. So in what manner can that gentleman perform that job description? That is not service if he cannot perform the job description. And that's where the board came from on this. And if he is working part time, can he accumulate credits for pension? It does not appear that that's the case. And the testimony from the police chief was that once he ran out of sick leave or vacation time or whatever accrued time he had, he would only be paid for four hours a day. May I continue? Do you have anything else? Well, I have to give the rest of her answer. That he would only be paid four hours a day. Now, obviously, that's not the full benefits that he had been receiving. And according to the pension code, that would be considered a part-time police officer. Part-time police officers do not accrue creditable service, and therefore he would not continue to accrue creditable service. So in essence, he's being penalized because he can perform some of that position, but he would not be able to get all of the same benefits as he had before. Any other questions? Thank you, ma'am. Thank you. Have a good day. Mr. Smith. Good morning. Good morning. To the members of the court, Mr. Hunt, Ms. Thomas. As you know, I am here on behalf of Mark Cisnowski, a disabled police officer who seeks to retain the benefits given to him by the police pension board of the village. Let me first of all comment, if I might, that I think that what the village has attempted to do here is turn an administrative hearing, which is supposed to be a fact-finding inquiry into whether somebody is disabled, into full-fledged trials, such that if the village's position is correct, I don't think any police officer or firefighter will ever be able to get a pension. You look at the record, and certainly this court has heard numerous police pension matters. Have you ever seen a record that is put forth by this village in this manner? The depositions that are taken, it's become an enormous burden, and it's become an adversarial process. The village was given leave to intervene. They were not given leave to take on a crusade against their disabled police officer. So I think that the entire tenor of what the village has done here is taken what is supposed to be a fact-finding mission where the burden is on the applicant into an adversarial trial where they want to file motions. And let me, if I could for a second, address a question raised by Justice Zinoff regarding the motion that is qualifying me and my firm. And I would, with some trepidation but knowledge of the facts, disagree with what Mr. Hunt stated in all argument. And if you go to the record, you will see me arguing over the fact that I was handed this motion. On the day the hearing was supposed to start, and I objected because I wasn't even extended the courtesy. There was no call the night before. When we arrived at the hearing, I wasn't extended the courtesy of being handed the motion. Rather, when the five members of the board came out, then the village handed first the motion that is qualified on board and then gave me a copy. So the statement that he thought he gave me a call the night before is not true. And I'm not trying to argue outside the record. It's right in the record how I precipitously objected to the fact that this was being brought not on the eve of the hearing but at the actual hearing after the village first tried to disqualify one of the members, Trustee Briscoe. Why wasn't it a conflict of interest for you to represent your client and take a position contrary to the village's position if your law partner sat on village commissions? I would first of all point out, Justice, that the Board of Fire and Police Commissioners is a separate body. And it is true the members are appointed by the mayor with the concurrence of the village board. But they are not. They are a separate entity. They are separate from the village. And that is cited in our brief, the statutory authority for Board of Fire and Police Commissioners. So they are totally separate. Just as the police pension board has two members that are appointed by the village. Now if we take it to its logical extreme, and I think that's where the village goes, then when the village intervenes, should the two members that were appointed by the village be disqualified? Because they now have a conflict of interest. And this was exactly the issue that Justice Thies raised in her first district opinion. Pardon me? Justice Thies. Thies. Thank you. Raised in the Williams decision. And she said that was not what was ever intended. She never intended to disqualify the members who were appointed by the board. And this is what we get into when we turn this into an adversarial proceeding. The applicant here is faced with a board of which 40% is appointed by what the village now wants to be the adversary in this case. They're seeking to protect the interest of the fund. They're there arguing against their police officer. So I think if you take their view of conflicts, you're going to find that then the two members appointed by the village should be disqualified. And, again, I would point you to the Williams decision as being totally contrary. How many members are appointed on the board? Two are appointed by the village. Two are elected from the members of the sitting or current members of the force. And one is from the retired members. So there are five members. Three are elected. Two by the active members of the department. One by retired members. And two are appointed by the village. So does that then mean that four out of the five have conflicts of interest? I suggest none of them have conflicts of interest, Justice McConnell. Well, the point is if four out of five have a conflict of interest, it would seem that a majority of one might win the day. I suppose so. I mean, are the officers disqualified? You need a quorum, and there will never be a quorum. The quorum will stop having these hearings. Perhaps that's what the village wants. If I could turn, if I could answer the court's questions on the purported conflict, if I could turn for a second to the What's your take on Mr. Hunt's argument relative to the service to the department argument? I would point to a decision that is cited in our briefs, Pierce v. Pension Fund of the City of Waukegan, in which Justice McClary concurred. I would draw you to the court's, to the following court. The evidence demonstrates that the defendant was not capable of performing normal police duties at the time of his August 1986 application for disability pension. He was in a limited-duty status. So the court, this court, in the Pierce case said, look at the date of the application. Well, what is the date of the application in this case? The application was made August 24th of 2011. Now, Mr. Hunt has just argued, well, it was in September that he was assigned to the investigation division. So at the time of this application, he was not capable of performing what this court said, normal police duties. The letter that counsel refers to from the chief of police is dated March 21st of 2012. So the village isn't analyzing, it takes depositions of factors. Now, I want to change things and say, well, we're going to give you this letter from the chief in 2012. The Pierce case says, no, go back to the date of his application. And then they're going to try and create a position. But, you know, they never changed their job descriptions. The chief said that he would. My recollection is that these experts are supposed to testify that not only is the police officer disabled, but the condition is continuous or continuing. Is that not correct? That is correct, Justice McClarty. And I would say that the evidence showed that not only was he not able to work in a full day, that his condition over time deteriorated so that one could only logically assume that this knee isn't going to get better. He would be going down from four hours to maybe two hours a day. I would finally, if I may summarize it, that the first witness of the applicant was that Detective Jones testified the first requirement of an investigator is he must be able to complete all duties of a police officer. And the chief acknowledged that although the general orders of the department do not provide for light duty. And in my cross-examination of him, I pointed out that just while this case application was pending, there was a situation where a man walked into the police station with a gun and investigators had to respond rapidly and, in fact, fired and shot the man. And the chief acknowledged that certainly any member of the department would be expected to react. And that's exactly the situation that the doctor said that my client was unable to perform. I thank you. If there are no other questions. I do have a question. Mr. Hunt talked about the board having the inherent authority to address motions such as motions to disqualify a member of the board or yourself. What's your response to the concept of how far the board's inherent authority goes? In other words, assuming that the motion had been properly, timely, tendered, et cetera, would the board have authority to entertain that motion and to grant it if they saw fit? Well. I mean, I thought it was a lot of questions, but. Well, and I should address them. I think, first of all, they're a statutory preacher, so you would have to find where in the statute do they have the authority to do that. And respectfully, I don't think they have that authority. Number two is we look at the case law, administrative law, and hearings. The name of the case is skimmed right now, but it talked about a conflict of a member of the board in saying that there's a presumption of integrity and good standing of any member of a board. And that if they felt there was a conflict, it was inherent on them to disqualify themselves, but that they weren't supposed to do that. The only analogy would be the election commissions. If somebody has a conflict, they're still supposed to hear it unless there's a statutory basis for them to step down, i.e., they're a candidate for the office or something like that. So respectfully, Justice Jorgenson, I believe that there is no authority for that. And no inherent authority. No inherent authority, and particularly in a situation such as this that I had been involved in a case for over a year at that point. And the village, Sue Esponte on the day of hearing brings this up, but if they had brought it up in the beginning, I don't believe that there is any conflict. My partner's service to his community. And I believe that when counsel argues a client, the village of Vernon Hills is not a client of my law firm. My partner happens to sit on one of their boards without paying to decide hiring and firing the police officers. Nothing to do with the pension board. Did you say police officers? Pardon me? Did you say police officers? Yes, if I misspoke, but that's what I meant. The board upon which my partner serves hires and fires police officers and promotes them. It has nothing to do with pension. There's a separate statute. Is that called the police and fire commission? Pardon me? The police and fire commission. Yes. It can't even be the civil service commission. It's just a different section. But again, once constituted, it's a separate entity created just so politics wouldn't affect the hiring and firing of police officers. That's why the police officers are given that protection of the board of fire and police commissioners to be separate and independent from the village. So in this case, there was no conflict. It's a made up red herring to try and get around the decision of the board. And I would respectfully submit that the board's decision should be affirmed. If I've answered all your questions, I've exceeded my time. Thank you. Thank you. Mr. Hunt. Thank you. First of all, Mr. Smith just brought up a situation where somebody walked into a police station at night in an effort to sensationalize the role that somebody might have to play. There is no evidence in the record that shows that that person ever responded as was an investigator. In fact, it happened at night and investigators only work during the day. So it wasn't an investigator who responded. It was a patrol officer who happened to be in the dispatch area at the time the citizen walked in. The decision on what is proper service or what is service to the department we respectfully submit is a decision made by management in the first instance reviewable by the circuit court and by this court. Officer Cisnowski was rendering service to the department in any role that he had after being returned to active duty in September of 2011. I respectfully disagree with Ms. Thomas, who indicated that Dr. Levin, it's not Levine, it's Levin, had not testified that Officer Cisnowski could perform the duties for eight hours a day. He clearly said so at page 41 of his deposition, and we've included in our brief the site to the administrative record and to the common law record here. He also made the remarks that in his deposition that she referred to, did he not? He made also make those remarks. In reviewing his record, he did acknowledge the remarks that were in his records. But when pressed on the issue, when shown the video, when shown the video of Officer Cisnowski at a golf outing for more than eight or ten hours in a day, specifically said, you know what, given the fact that there's a limitation on his role, that he has a desk job, that he's not being required to go make arrests, as the chief clearly pointed out in the March 21st memo, when he said, you will be essentially assigned to a desk position within the investigation session. Given your present condition, I would expect that all of your duties and responsibilities would be performed at your desk, subject to later revision as your medical condition improves. So if he had to make an arrest, it would be at his desk? That's where he's assigned to do work. The only other thing he was allowed to do is if he needed to get up and stretch his legs. And this really gets to the basic tension, I think, that exists between the present situation and the village's obligations under the Americans with Disabilities Act, which we raised at the time of the hearing. The village has an affirmative obligation to assist an employee in performing essential job functions and or to restrict job functions in any way that's appropriate so that the employee can continue gainful employment. So where do you draw the line between accommodating physical limitations and improperly creating a position to deprive an applicant of benefits? Well, the key here, unlike the decision that was in the Danko case, which we think is really not good law anymore after Peterson, Kouzoukis, and Howe out of the First District, which was decided, coincidentally, while this case was being briefed, these positions exist. These positions in investigations have existed for many years, and investigators have continued to do that. I brought up in my opening position on Superior. Let me just ask you this. Why not change the job description? Why not remove from the job description those things which this individual cannot do? Because the job description exists in a general sense, and the obligation under the Americans with Disabilities Act is to then say, okay, what of your job is it that you're capable of doing, and do you require any specific accommodation? And the accommodation the village gave him, unlike other officers who might be rotated through investigations as part of their overall training and development as police officers, the village said, you can have this job permanently, and for so long as you're medically prohibited from going out and effectuating arrests, you don't have to do that. We have enough other work for you to do, following up on cybercrime, Internet crime, fraud cases where you can call and be interviewing people by phone, by doing investigative work on the computer, and writing reports. We have enough work to keep you busy eight hours a day. The fundamental problem, and this came up, I think, in response to your question, Justice Alford, was that, may I continue? Yes. Was that Officer Cisnoski ran out of paid time. He was, in response to your earlier question, continuing to accrue pension credit the entire time he was working in this position, even when it was only four hours, because he was being paid a full-time salary based on his comp time, his overtime, or his accrued paid time off. It wasn't until he ran out of time on the books that this became an issue, and that was very shortly before the pension board hearing. But the entire time from the filing of the pension application up until very shortly before the hearing, he was either on workers' comp and was receiving 100 percent of his pay through PETA, or he was receiving it through application of the comp time. If I may conclude, we believe that in the first instance, it is the obligation of the attorney to address the professional obligations, not the other side to bring it up. We did bring it up as soon as we learned about the issue. In terms of the Briscoe conflict, we know that the situation was not merely because President of the Board Briscoe sat on the board, but rather because of his role as a sergeant and the first-line supervisor overseeing Officer Cisnoski during three or four separate time periods in which he was required to interact with Cisnoski, to speak with him, to find out how he was doing, to find out when he could come back. The point there is very simple. He could certainly be fair, though, correct? He had no qualms about whether or not he could be fair. That's in the record. The issue is not whether he was prejudiced. The issue is whether or not, as a finder of fact, he would be utilizing information gained outside the four corners of the administrative record. Isn't there another definition of bias and prejudice? Well, I suppose it's a different kind of bias. It's not that he has personal discriminatory animus towards somebody or doesn't like them or had some prior conflict with them. Rather, it's a question of whether or not he's going to be making decisions based solely on the facts. And for that reason, he should have either recused himself or whatever. Finally, with respect to the permanency of the situation, it is clear not only from the chief's testimony and the deputy chief's testimony and village manager Allison's testimony that the position was permanent, but he also did have all of the guarantees regarding the permanency of his employment. He could only be removed by going before the Board of Fire and Police Commissioners. He had louder no rights. He had equal protection rights, due process rights. He had all the statutory rights of any other police officer in the state of Illinois prior to being removed. He had a property interest in his employment, and therefore, it could only be removed by going through all of those formal processes. So it is not a situation where he was not given a permanent position. He was, and the village bent over backwards. He's a good officer, and the village tried to keep him at work. But instead, you know, he claims he can't crouch down and get those video evidence that the board ignored that he was getting up off the ground after fixing his daughter's vehicle. He claims he can only work four hours, which was the only evidence. We have pencil archives credibility issues, which are, it is not for us to impose our belief on the evidence presented, but to determine whether or not there was a basis for it. But in this case, Justice Jorgensen, the board completely ignored more than half of the evidence. All the video exhibits, never even considered or referenced any of the medical testimony through the depositions. They relied on the paper, and they applied the standard of whether or not he could continue to perform patrol duties, not whether he was rendering service to the department. And on that basis, they applied the wrong standard. And ultimately, he should be put back to work. I would note that that in each case in which this was done, whether it's in the Thoreau situation or whether it's in Peterson or bazookas or any of the other cases, all of this relief ultimately came at the appellate court of the Supreme Court. As we ask that you reverse the decision of the pension board and determine that officers is nasty, is capable of rendering service to the department. Thank you very much. Thank you. It'll be a short recess.